IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| DOROTHY PHILLIPS, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>CAPITAL ONE BANK (USA), N.A. and CAPITAL ONE FINANCIAL CORPORATION,<br><br>Defendants. | Civil Action No.<br><br><br><br>JURY TRIAL DEMANDED |

**CLASS ACTION COMPLAINT**

Plaintiff DOROTHY PHILLIPS ("Plaintiff"), individually and on behalf of all others similarly situated, for her complaint against Capital One Bank (USA), N.A. ("COBNA") and Capital One Financial Corporation ("Capital One Financial"), alleges upon information and belief, except as stated herein and as to the allegations which pertain to Plaintiff and her counsel, which claims are based on personal knowledge, as follows:

**INTRODUCTION**

1.     Defendants are one of the largest issuers of credit cards in the nation.  As of the end of 2008, Defendants were the 4th largest issuer of Visa® and MasterCard® credit cards in the United States, reflecting $17 billion of American consumer debt.

2.     While "Capital One" credit cards are issued by COBNA, COBNA is a wholly-owned and controlled subsidiary of Capital One Financial, which reports the results from COBNA's credit card operations as part of Capital One Financial's public financial statements.

3.     In May 2009, Congress passed the Credit Card Accountability Responsibility and

1

Disclosure Act of 2009, creating substantial new rights for credit card holders and imposing restrictions and additional disclosure requirements on credit card issuers. Prior to passage of that statute, the Federal Reserve amended Regulation Z (12 C.F.R. §226.1 *et seq*.) and Regulation AA (12 C.F.R. §227.1 *et seq*.), so as to provide additional new credit card consumer protections.

4.      As has been widely reported, credit card issuers used the period before the effective date of the new federal laws and regulations to unilaterally impose higher interest rates on many card members in a fashion that would be unlawful once the new laws took affect.

5.      Defendants are among the credit card issuers who engaged in unilateral efforts to raise the interest rates on their credit cards. In their haste to do so, Defendants failed to provide the notice of interest rate increase to Plaintiff and other class members. Even without having provided the required notice, Defendants unilaterally increased the rate on Plaintiff's and class members' Capital One credit cards.

6.      Plaintiff is the holder of a Capital One Visa Platinum No Hassle Rewards Credit Card. Prior to the period ending April 18, 2009, Plaintiff's Capital One credit card was subject to an annual percentage rate ("APR") of 9.9%. Beginning the next billing cycle, Defendants unilaterally and without prior notice to Plaintiff, increased the APR on her Capital One credit card to 17.9% for both new and prior purchases. This action caused the finance charges on Plaintiff's Capital One credit card to essentially double, thereby injuring Plaintiff. For every billing cycle thereafter, Defendants have been calculating and assessing finance charges to Plaintiff at the higher APR ever since, further causing injury and damage to Plaintiff.

7.      Defendants' acts, practices, conduct and omissions breached Plaintiff's and class members' card members' agreements, violated the Truth In Lending Act (15 U.S.C. §1601 *et*

*seq.* ("TILA")) and comprise unjust enrichment to Defendants.

8.    Plaintiff and the class seek damages, statutory and exemplary damages, equitable and declaratory relief to remedy Defendants' breaches of contract and statutory violations. Plaintiff and the class also seek a finding and declaration under the Declaratory Judgment Act that Defendants' challenged practices are unlawful and/or inequitable.

## JURISDICTION AND VENUE

9.    Plaintiff invokes the subject matter jurisdiction of this Court pursuant to 28 U.S.C. §1331.

10.    Plaintiff alternatively invokes the subject matter jurisdiction of this Court pursuant to 28 U.S.C. §1332 and the Class Action Fairness Act.

11.    A further basis for subject matter jurisdiction of this Court exists pursuant to 28 U.S.C. §2201. In addition, this Court has supplemental jurisdiction over Plaintiff's and Class members' state and common law claims pursuant to 28 U.S.C. §1367(a).

12.    This Court possesses personal jurisdiction over each Defendant based on each Defendant's residence, presence, transaction of business and contacts within the United States, Massachusetts and/or this District.  Defendants have further availed themselves to Massachusetts by commencing actions in the Massachusetts federal and/or state courts.

13.    Venue is proper in this District pursuant to 28 U.S.C. §1391 because Plaintiff resides in this District and because Defendants have at all relevant times conducted substantial business in this District.

## PARTIES

### Plaintiff

14.    Plaintiff Dorothy Phillips is a resident of Salem, Massachusetts and has resided within this District at all relevant times. Plaintiff and her husband are holders of a Capital One Visa Platinum No Hassle Rewards Credit Card.  Prior to the period ending April 18, 2009, Plaintiff's Capital One credit card was subject to an APR of 9.9% for both purchases and cash advances.  Beginning the next billing cycle, Defendants unilaterally and without prior notice to Plaintiff (which notice is required by Plaintiff's contract and TILA), increased the APR on her Capital One credit card to 17.9% for both new and prior purchases and to 24.9% for cash advances.  Defendants have been calculating and assessing finance charges to Plaintiff at the higher APR ever since.  As a result of Defendants' actions, Plaintiff has been damaged, injured and has suffered an ascertainable loss as a result of Defendants' breaches of contract, TILA violations and false, deceptive, misleading, unfair and unconscionable methods, acts, practices and conduct.  Since Plaintiff's Capital One credit card is still active, the injuries caused by Defendants' unlawful acts will continue until abated or enjoined.  Plaintiff has been injured in a manner common and typical of other Class members.

### Defendants

15.    Capital One Financial is a Delaware corporation with its principal place of business and headquarters located at 1680 Capital One Drive in McLean, Virginia.  It is a bank holding company registered under the Bank Holding Company Act.   Capital One Financial's primary business is the operation and control of COBNA and another wholly-owned subsidiary that engages in retail and deposit banking in certain states.  According to its Form 10-K for the

4

year ended December 31, 2008: "Capital One is one of the largest banks in the United States. We are a diversified banking corporation focused primarily on consumer and commercial lending and deposit origination." Capital One Financial controls and operates its credit card business through its "National Lending" segment, which includes the "U.S. Card sub-segment which consists of domestic consumer credit and debit activities." Capital One Financial described itself and its business in a July 18, 2008 letter to the Federal Reserve Board of Governors, commenting on proposed changes to Regulation Z:

> Capital One Financial Corporation (www.capitalone.com) is a financial holding company whose subsidiaries collectively had $92.4 billion in deposits and $147.2 billion in managed loans outstanding as of June 30, 2008. Headquartered in McLean, VA, Capital One has 740 locations in New York, New Jersey, Connecticut, Texas and Louisiana. It is a diversified financial services company whose principal subsidiaries, Capital One, N.A., Capital One Bank (USA), N.A., and Capital One Auto Finance, Inc., offer a broad spectrum of financial products and services to consumers, small businesses and commercial clients. Among its product lines, Capital One is one of the largest issuers of Visa and MasterCard credit cards in the world, A Fortune 500 company, Capital One trades on the New York Stock Exchange under the symbol "COF" and is included in the S&P 100 index.

16.    Capital One Bank (USA), N.A. (again "COBNA") is federal bank headquartered in Glen Allen, Virginia. As of February 2008, COBNA has been considered a "Limited Purpose Bank" by the Officer of the Comptroller of the Currency, due to its limited product line of offered banking products. Prior to October 19, 2007, the predecessor to COBNA was a Virginia-state chartered bank. COBNA's principal business comprises issuing, marketing servicing credit and debit cards and the attendant consumer loans. COBNA is and has always been a wholly-owned and controlled subsidiary of Capital One Financial. Many of the officers and directors of Capital One Financial are simultaneously officers and directors of COBNA.

## FACTUAL ALLEGATIONS

17.     In 1988, Congress strengthened TILA's protections for credit card consumers through enactment of the Fair Credit and Charge Card Disclosure Act, "a bill to provide for more detailed and uniform disclosure by credit and charge card issuers, at the time of application or solicitation, of information relating to interest rates and other costs which may be incurred by consumers through the use of any credit or charge card." S. Rep. No. 100-259, at 1 (1988), reprinted in 1998 U.S.C.C.A.N. 3936, 3937.

18.     In May 2009, Congress and the President enacted the Credit Card Accountability Responsibility and Disclosure Act of 2009. That statute provides for substantial additional protections for credit card consumers, and creates substantial additional restrictions and disclosure requirements on credit card issuers.

19.     In 2008, the Federal Reserve also amended applicable regulations affecting credit card issuers, including Regulation Z and Regulation AA.

20.     Capital One Financial's Form 10-K for the year ended December 31, 2008 discussed some of the changes in the federal laws, and expressly acknowledged Defendants' obligations to comply with federal laws and regulations providing protections to credit card consumers:

New Regulations

On December 18, 2008, the Federal Reserve amended Regulation AA to include new rules that would place limitations on certain credit card practices. Among other things, the final rules: (i) impose restrictions on increases in the rate charged on pre-existing credit card balances; (ii) prohibit the use of payment allocation methods that maximize interest charges; (iii) limit the imposition of "default" annual percentage rates on existing credit card balances; (iv) prohibit the imposition of interest charges using the "two-cycle" billing method; and (v) require that consumers receive a certain amount of time to make their credit card payments. These rules must be implemented by July 1, 2010. While many of the

provisions in the new rules are targeted at practices in which Capital One has not engaged, we anticipate that we will need to make significant changes to current account risk management strategies to address the new limitations these rules impose.

The Federal Reserve also amended Regulation Z on December 18, 2008 to change a number of disclosure and other obligations for credit cards. Among other things, the final rule requires changes to: (i) solicitation and application disclosures; (ii) account opening disclosures; (iii) periodic statements; (iv) disclosures regarding changes in terms; and (v) convenience check disclosures. These rules also must be implemented by July 1, 2010. The amendments will require substantial modifications to virtually all marketing and account management communications.

***

In addition, the Federal Reserve Board recently passed amendments to Regulation AA (Unfair or Deceptive Acts or Practices) and Regulation Z (Truth in Lending), effective July 1, 2010, which limit or prohibit certain credit card practices and require increased disclosures for consumers. Although the Company has not engaged in many of the practices prohibited by the amendments, the rules could have a material adverse effect on future revenues in our U.S. credit card business and could make the card business generally less resilient in future economic downturns. In particular, the rules will prohibit an increase in the interest rates applied to existing credit card balances except in limited circumstances. Likewise, several bills pending before Congress could impact credit card pricing and other terms.

21.     In its Form 10-Q for the three months ended June 30, 2009, Capital One Financial

further discussed the impact on the new federal credit card legislation and regulations:

New Legislation and Regulation of Consumer Lending Activities

On December 18, 2008, the Federal Reserve amended Regulations Z and AA to include new rules that would change a number of disclosure and other obligations for credit cards and other open-end loans and place limitations on certain credit card practices. Among other things, the final rules will require extensive changes to disclosures for solicitations and applications, account opening, periodic statements, changes in terms, and convenience checks. These rules must be implemented by July 1, 2010.

Several of the new provisions of Regulation AA were later superseded by Congress, which amended the federal Truth-in-Lending Act and other consumer regulations by enacting the Credit Card Accountability Responsibility and

Disclosure Act of 2009 ("Credit CARD Act of 2009"). The Credit CARD Act of 2009 expands the disclosure requirements and prohibitions detailed in the Regulation Z and AA final rules. Among other things, the Credit CARD Act of 2009 will:

- restrict increases in the rates charged on pre-existing credit card balances;
- mandate 45-days notice before any increase of an interest rate or any other significant change to credit card account terms and provide consumers with a right to cancel their accounts before any changes would apply to them;
- require issuers to consider decreasing interest rates increased since January 1, 2009 on a rolling six-month basis;
- prevent "over-the-limit" fees unless a cardholder has agreed to receive over-the-limit protection, and limit the number of such fees that can be charged for the same violation;
- limit the amount of any penalty fees or charges to amounts that are "reasonable and proportional to the omission or violation";
- limit the amount of fees charged to credit card accounts with lower credit lines;
- mandate delivery of periodic statements 21 days before the due date and end of any grace period;
- require that payments above the minimum payment be applied to balances with the highest interest rates first; and
- prohibit the imposition of interest charges using the "two-cycle" billing method.

Since many of these provisions are likely to be the subject of further rulemakings by the Federal Reserve and other regulatory authorities, the provisions and impact of this new law will become more certain over time. However, this new law will impact the rates and fees that can be charged to consumer credit card accounts across the industry. The majority of the provisions of the Credit CARD Act of 2009 will become effective on February 22, 2010, with certain provisions such as the 45-day prior written notice requirement, the right to cancel and the statement delivery requirements becoming effective on August 20, 2009 and others related to reasonable and proportional penalty fees and consideration for rate decreases becoming effective on August 22, 2010.

22.    To avoid the impact of the new laws, many credit card issuers unilaterally increased card members' interest rates prior to the effective date of the new laws and regulations.

23.    An article appearing in the August 18, 2009 edition of <u>The Wall Street Journal</u>,

8

entitled *What To Expect As New Credit Card Rules Take Effect*, described these events as

follows:

> Starting Thursday, banks must comply with parts of the recently passed Credit
> Card Act of 2009 by mailing bills at least 21 days before their due dates and
> providing at least 45 days' notice before making a significant change to their rates
> or fees. Currently, banks are generally required to mail billing statements at least
> 14 days in advance and provide a 15-day notice of altered fees or rates. The new
> rules also will bar banks from increasing fees and rates without warning when a
> consumer misses a payment or exceeds a credit limit.
>
> Consumers also will be allowed to avoid future interest-rate increases and pay off
> any outstanding balance over time under the original rate terms. Currently, if a
> consumer gets hit with a penalty rate, for example, they aren't given the option to
> reject the rates.  The bulk of the legislation's key provisions will take effect in
> February 2010, including limits on interest-rate increases on existing balances.
> The following July will see the introduction of new disclosure rules, drafted and
> approved by the Federal Reserve Board and other banking regulators.
>
> \*\*\*
>
> According to Consumer Action's 2009 credit-card survey, which looked at 39
> cards from 22 financial institutions, rates and fees began climbing this spring. The
> advocacy group said more credit cards now come with minimum cash-advance
> fees and higher balance-transfer and foreign-transaction fees.
>
> "There's no question that issuers are taking advantage of this window before it
> closes to make as many changes as freely as they've been accustomed to," said
> Ruth Susswein, Consumer Action's deputy director, national priorities.

24.     In an article appearing in the August 9, 2009 edition of <u>The Richmond Dispatch</u>,

entitled *Credit Card Industry Faces Uncertainty As Reforms Loom*, Richard Fairbank, chief

executive office and chairman of Capital One Financial, was quoted as acknowledging the

sweeping financial impact of the new credit card rules:

> Just 77 days after President Barack Obama signed the Credit Card Accountability
> Responsibility and Disclosure Act of 2009, and six months before it will take
> effect, credit-card issuers are scrambling.
>
> They are seeking ways to keep making money in a bad economy with rising
> unemployment and credit-card defaults while preparing to implement major

changes in how they deal with consumers.

In interviews, industry officials discussed the impact the act, which takes effect in February, will have on issuers:

• The industry will have a lot less free rein to hike cardholder rates and fees.
• It will have increased costs and lost revenue because of the reforms.
• Many consumers will find it harder to qualify for credit cards at the most favorable terms.

"We can't discuss the card business without addressing the elephant in the room of the recently signed industry law," Richard D. Fairbank, chairman of McLean-based Capital One Financial Corp., said at a recent investors' and security analysts' conference in New York. It will clean up industry practices and lead to a reinvention of the industry, he said.

While the legislation contains provisions he would have preferred not to see, "overall it will play to Capital One's strengths," Fairbank said.

**Rates and risk**

Perhaps the most costly of the changes, from the vantage of the card issuers, will be a ban on the practice of raising rates on existing balances, except in certain instances. It is called re-pricing.

\*\*\*

Capital One, the largest independent U.S. issuer of credit cards and one of the largest employers in the Richmond area, changed the way the industry operates by using risk-based pricing.

Instead of charging everyone the same interest rate, Capital One offered its lowest rates to people considered the best credit risks and its highest rates to people more likely to default.

Capital One's pricing for risk always has been a powerfully competitive advantage, Fairbank said.

"But the widespread use of some of the soon-to-be-banned industry practices diminish the power of that advantage," he said. "Now that the new law has effectively ended these practices, our competitive advantage in up-front underwriting and pricing for risk may once again be a key differentiator as it was for us in the '90s."

The transition will be rough as the industry adjusts to the new rules, Fairbank

said.

***

**New frontier**

Consumer advocates say the credit-card industry brought its woes upon itself. "We know these reforms will be costing money, plus it's a terrible time in the economy," said Linda Sherry, deputy director of Consumer Action. "But it's very hard for us consumer advocates not to say, 'You've made your bed, now you've got to lay in it.'" In the industry's favor, the law does not cap all rates or fees, or stop an issuer from introducing new higher-rate products or from imposing annual fees.

Also, issuers have another six months of freedom to continue the practices that prompted the legislative restrictions.

"I think these companies have to stop relying on the status quo and get to work finding new ways of doing business that perhaps will create consumer loyalty while building their revenues back up," Sherry said. "Going forward, they will have to build up more innovative ways of doing business through the fair treatment of consumers."

25.    The credit card industry's unilateral actions to avoid the consumer protections in the new laws has angered lawmakers:  "'We are not happy on what we're hearing on what banks and credit card companies are doing in advance of the effective date,' said [U.S. Representative Barney] Frank aide Steven Adamske."  Reuters, *Rep. Frank Eyes Dec. 1 As Credit Card Rules Start Date*, (Sept. 16, 2009).   "The new rules will sharply restrict credit card issuers' powers to raise interest rates on cardholders' existing balances, charge some fees and slap cardholders with unreasonable penalties." *Id*.

26.    At all relevant times, Plaintiff has received her monthly Capital One credit card statements by electronic transmission from Defendants to her e-mail address.  Plaintiff's e-mail address has not changed during the relevant time period.

27.    Plaintiff's mailing and billing address is correctly listed on the monthly statements sent to her by Defendants.  Defendants have sent mail to Plaintiff at the address listed on her monthly statements, including multiple offers to transfer balances to her Capital One credit card.  Plaintiff has not resided at any other location during the relevant time period.

28.    For the billing period running from March 19, 2009 to April 19, 2009, and previously, the APR charged to Plaintiff by Defendants was 9.9% for purchases and cash advances.

29.    Without prior, written notice, the interest rate and APR charged on Plaintiff's Capital One credit card for the April 19, 2009 to May 18, 2009 billing cycle, and in all subsequent statements, was unilaterally increased to 17.9% for both new and prior purchases, and 24.90% for cash advances.  At no time during this or the prior billing cycle had Plaintiff's payment to Defendants been late or past the "due date" to pay her monthly credit card bill.

30.    As evidenced by her Capital One credit card statements, beginning with the April 19, 2009 to May 18, 2009 billing cycle, and in all subsequent statements, Defendants calculated the finance charges due by Plaintiff for both existing balances and new purchases using the improper, increased interest rates and APR, causing injury and damage to Plaintiff.  Defendants have not refunded to Plaintiff or her husband the additional finance charges resulting from the improper, higher interest rates and APR.  Substantially-similar injuries have been incurred by all class members due to substantially-similar conduct by Defendants, or either of them.

31.    After receiving her electronic statement for the billing period ending May 18, 2009, Plaintiff called COBNA to object and complaint about the increase of her credit card interest rates and APR.  COBNA's representatives acknowledged to her that the interest rate

increases were not due to any act or delinquency on the part of Plaintiff, but nonetheless stated that COBNA would not lower Plaintiff's credit card interest rates to their pre-increase levels.

32.    A *Change in Terms 2009* notice disseminated by Defendants to credit card customers <u>other than Plaintiff and class members</u> concedes that Defendants increased those card members interest rates and APR in the months following passage of the new federal credit card laws and regulations based on the unilateral decision of Defendants, and not due to the individual conduct of Capital One credit card holders.  Defendants state as following in that notice (which notice was not provided to Plaintiff or class members, timely or otherwise):

> Due to extraordinary changes in the economic environment, we're reviewing our existing credit card accounts.  Having considered these economic conditions, your account's current Purchase rate, and the length of time you've had this rate and account, we will be increasing your Purchase rate.  We're also raising your Cash Advance and Default rates.  The following changes will be effective for billing periods that begin after April 7, 2009.

33.    That *Change in Terms 2009* notice also advised Capital One credit card holders that:  "**You have the right to decline these changes….**" (emphasis in original).  Plaintiff and class members were neither provided with this notice or a right to decline the increased interest rates and APR unilaterally imposed by Defendants.

34.    While blaming the economy for the interest rate increases imposed on its credit hard consumers, Capital One Financial received $3.55 billion of American taxpayer money from the Treasury Department's Troubled Asset Relief Program ("TARP").

**<u>Capital One Financial and COBNA Shared the Financial Benefits of Their Unlawful Acts</u>**

35.    Capital One Financial admits that finance charges collected by COBNA are reported in Capital One Financial's Form 10-K, among other places, as "servicing and securitizations income" on Capital One Financial's Income Statement.   According to Capital

One Financial's 2008 Form 10-K, gross "interest income" from Capital One Financial's "National Lending Segment" exceeded $13 billion, and was nearly $9 billion after deducting "interest expenses.

**Capital One Financial Controlled, Participated-In and Profited-From COBNA's Conduct**

36.    In its 2008 Form 10-K, Capital One Financial lists COBNA as one of its two primary subsidiaries.  That Form 10-Ks concedes that Capital One Financial not only owns, but controls, its COBNA subsidiary.

37.    COBNA's operating results are reported by Capital One Financial in its financial statements.

38.    Richard D. Fairbank is simultaneously the Chairman of the Board and Chief Executive Officer of Capital One Financial and COBNA.

39.    Lewis Hay simultaneously serves as a Director of Capital One Financial and COBNA.

40.    Ann Fritz Hackett simultaneously serves as a Director of Capital One Financial and COBNA.

41.    Stanley Westreich simultaneously serves as a Director of Capital One Financial and COBNA.

42.    Gary Perlin is simultaneously the Chief Financial Officer of Capital One Financial, while serving as a Director of COBNA.

43.    Ryan Schneider is simultaneously the President, Card of Capital One Financial, while serving as a Director of COBNA.

## CLASS ACTION ALLEGATIONS

44.     Plaintiff brings this action on behalf of herself individually and on behalf of the following class:

> All Capital One credit card holders in the United States and its territories whose APR or interest rates were increased by Defendants, or either of them, which increase was not disclosed to the cardholder in writing at least 15 days prior to increases before August 20, 2009, or at least 45 days prior to increases after August 20, 2009 (the "Class").

Excluded from the Class are Defendants, their parents, subsidiaries, officers, directors, employees, partners and co-venturers.

45.     This action is brought as a class action pursuant to the provisions of Rule 23 of the Federal Rules of Civil Procedure, sub-sections 23(a) and 23(b)(2) and/or (b)(3).  The Class satisfies the numerosity, commonality, typicality, adequacy, predominance and superiority requirements of Rule 23.

46.     The members of the Class are so numerous that joinder of all Class members is impracticable.  While the exact number of Class members can be determined only by appropriate discovery, Plaintiff believes that members of the Class number at least in the of thousands of persons, disbursed throughout the United States and its territories.

47.     Because of the geographic dispersion of Class members, there is judicial economy arising from the avoidance of a multiplicity of actions in trying this matter as a class action.

48.     Plaintiff's claims are typical of the claims of the members of the Class.  Plaintiff has no interests that are adverse or antagonistic to those of the Class.  Plaintiff's interests are to obtain relief for herself and the Class for the harm arising out of the common methods, acts,

15

practices and conduct pled herein.

49.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in complex and consumer class action litigation.

50.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy.  Since the damages suffered by each member of the Class are relatively small, the expense and burden of individual litigation make it virtually impossible for Plaintiff and members of the Class to individually seek redress for the wrongful conduct alleged.

51.     In addition, Defendants have acted and refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive and declaratory relief appropriate to enjoin and cease Defendants' unlawful and inequitable practices.

52.     Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether Defendants breached their contractual obligations to Plaintiff and the Class;

(b)     whether Defendants violated the Truth in Lending Act and/or Federal Reserve Regulation Z;

(c) whether Defendants' methods, acts, practices and conduct were false, misleading, deceptive, unfair, unconscionable and/or a violation of Federal Reserve Regulation AA;

(d)     the proper measure of damages to be paid to Plaintiff and the Class;

16

(e)      whether Plaintiff and the Class are entitled to injunctive or other equitable relief to remedy Defendants' past and continuing violations of law alleged herein;

(f)      whether Defendants have been unjustly enriched by their inequitable and unlawful conduct, and if so, whether Defendants should be forced to disgorge inequitably obtained revenues or provide restitution; and

(g)      whether this Court should find, hold and declare, pursuant to the Declaratory Judgment Act, that Defendants' methods, acts, practices and conduct are unlawful or inequitable.

53.      The Class is readily definable, and prosecution of this action as a class action will reduce the possibility of repetitious litigation.

54.      Plaintiff and her counsel know of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.

## COUNT I

### BREACH OF CONTRACT

### (By Plaintiff and All Class Members)

55.      Plaintiff repeats and realleges paragraphs 1 through 54 as though set forth herein.

56.      Plaintiff and members of the Class entered into contracts with Defendants setting forth the terms and conditions of their deposit accounts.

57.      As to Plaintiff's and class members' right to receive notice prior to an increase in credit card interest rates, Defendants' standard "Customer Agreement" states:

**Changes in Terms**. We may add to, remove, amend or change any part or Provision of this Agreement, including the annual percentage rate(s) and any charges (including adding new provisions of the same or a different nature as the existing provisions in this Agreement) at any time.  If we do so, we will give you notice of such amendment or change if required by Federal or Virginia law (to the extent not preempted by Federal

17

law) unless we had previously notified the customer that the account would be subject to such amendment or change without notice.  <u>Notice will be mailed to the last billing address indicated in our records for the account</u>.  However, no notice will be mailed if we previously had notified you that your account would be subject to such amendment or change without notice.  Changes to the annual percentage rater(s) will apply to your existing account balance from the effective date of the change, whether or not the account balance includes transactions billed to the account before the change date and whether or not you continue to use the account.  Changes to fees and other charges will apply to your account from the effective date of the change.

Emphasis added.

58.    Defendants' agreement to provide notice to Capital One Visa No Hassle Reward card members, like Plaintiff, is also contained in a document created by Defendants and styled

*Capital One® Important Disclosures*:

‡ **Can You Increase My APRs?**

We will not increase your introductory APRs for any reason before the end of the introductory period. Your variable APRs can go up or down as the Prime rate goes up or down. If your payment is received late (3 or more days after your payment due date) twice within any 12 billing periods, we may increase your APRs immediately to the Default APR disclosed above. If we increase your APRs for late payments, we will return you to your prior non-introductory APRs if you make at least the minimum payment on time for 12 consecutive billing periods. In the future, we may increase your APRs if market conditions change. <u>If we increase your APRs for any reason other than an increase in the Prime rate or if you paid late as disclosed above, we will notify you in writing of your options in advance, including the right to opt out.</u>

Emphasis added.

59.    The terms and conditions of Defendants' contracts with Plaintiff and all Class members, along with Plaintiff's and Class members' contractual rights deriving from those contracts, are dictated and supplemented, in part, by TILA, Regulation Z and Regulation AA. For example, Defendants' standard Customer Agreement states as to the "Finance Charge" that Defendants can charge their card members:  "You will also be assessed finance charges as

previously disclosed to you as part of the TILA Account Disclosures or as we will disclose to you if required by applicable law."

60.     Defendants breached their contracts with Plaintiff and the Class by increasing Plaintiff's and Class members' interest rates and APR without prior, written notice that complied with Defendants Customer Agreements and representations in documents styled *Capital One® Important Disclosures*, TILA and Regulations Z and/or AA.  Defendants further breached their contracts with Plaintiff and Class by thereafter calculating finance charges for new and existing balances at the new, higher interest rates and APR.

61.     Defendants have also violated the implied duties of good faith and fair dealing that apply to Plaintiff's and all Class members' agreements.

62.     By reason of Defendants' breaches of Plaintiff's and Class members' agreements, Plaintiff and Class members suffered financial injuries, which injuries will continue until Defendants' unlawful conduct is enjoined or abated.

<u>COUNT II</u>

**VIOLATIONS OF TILA**

**(By Plaintiff and All Class Members)**

63.     Plaintiff repeats and realleges paragraphs 1 through 54 as though set forth herein.

64.     Plaintiff and each Class member is a "person" as that term is defined in 15 U.S.C. §1602(d) and a "consumer" as that term is defined in 15 U.S.C. §1602(h).

65.     Defendants are each "creditors" as that term is defined in 15 U.S.C. §1602(f).

66.     The credit card loans made by Defendants to consumers are required to adhere in all applicable respects to TILA and Regulation Z, adopted by the Federal Reserve Board to

implement TILA.

67.    TILA "assure[s] [] meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit, and to protect the consumer against inaccurate and unfair credit billing and credit card practices."  15 U.S.C. §1601(a).

68.    Prior to August 20, 2009, Regulation Z addressed when and how notice of changes in terms must be given.  Regulation Z, 12 C.F.R. §226.9(c)(1) provides as follows:

> Written notice required. Whenever any term required to be disclosed under §226.6 is changed or the required minimum periodic payment is increased, the creditor shall mail or deliver written notice of the change to each consumer who may be affected. The notice shall be mailed or delivered at least 15 days prior to the effective date of the change.  The 15-day timing requirement does not apply if the change has been agreed to by the consumer, or if a periodic rate or other finance charge is increased because of the consumer's delinquency or default; the notice shall be given, however, before the effective date of the change.

Regulation Z, Section 226.6 requires that a creditor disclose *inter alia* "each periodic rate that may be used to compute the finance charge." 12 C.F.R. §226.6(a)(2).

69.    As alleged herein, Defendants did not provide the requisite 15-day written notice to Plaintiff or class members prior to increasing the interest rates and APRs imposed by Defendants used to calculate the finance charges on their Capital One credit cards.

70.    After August 20, 2009, pursuant to TILA amendments enacted as part of the Credit Card Accountability Responsibility and Disclosure Act of 2009, 15 U.S.C. §1637 mandates 45-days notice prior to increasing a consumer's credit card interest rates:

> (i)    Advance notice of rate increase and other changes required.
>
> (1)    Advance notice of increase in interest rate required. In the case of any credit card account under an open end consumer credit plan, a creditor shall provide a written notice of an increase in an annual percentage rate (except in the case of an increase described in paragraph (1), (2), or (3) of section 171(b) [15

20

USCS §1666i-1(b)]) not later than 45 days prior to the effective date of the increase.

(2)     Advance notice of other significant changes required. In the case of any credit card account under an open end consumer credit plan, a creditor shall provide a written notice of any significant change, as determined by rule of the Board, in the terms (including an increase in any fee or finance charge, other than as provided in paragraph (1)) of the cardholder agreement between the creditor and the obligor, not later than 45 days prior to the effective date of the change.

(3)     Notice of right to cancel. Each notice required by paragraph (1) or (2) shall be made in a clear and conspicuous manner, and shall contain a brief statement of the right of the obligor to cancel the account pursuant to rules established by the Board before the effective date of the subject rate increase or other change.

(4)     Rule of construction. Closure or cancellation of an account by the obligor shall not constitute a default under an existing cardholder agreement, and shall not trigger an obligation to immediately repay the obligation in full or through a method that is less beneficial to the obligor than one of the methods described in section 171(c)(2)], or the imposition of any other penalty or fee.

15 U.S.C. §1637(i).

71.     Plaintiff and the Class have been injured as a result of Defendants' violations of TILA and Regulation Z, which injuries will continue until Defendants' unlawful conduct is enjoined or abated.

72.     Plaintiff is entitled to pursue an action and a class action against Defendants pursuant to 15 U.S.C. §1640 to redress Defendants' violations of TILA and Regulation Z.

## COUNT III

### COMMON LAW UNJUST ENRICHMENT

### (By Plaintiff and All Class Members)

73.    Plaintiff repeats and realleges paragraphs 1 through 54 as though set forth herein.

74.    As alleged herein, Defendants have unjustly benefited from their unlawful and/or inequitable acts resulting in the payment of money by Plaintiff and the Class members, which monies continue to be in the possession of Defendants.

75.    Defendants have and are continuing to derive profits and revenues resulting from their unlawful and/or inequitable conduct.

76.    It would be inequitable for Defendants to be permitted to retain any of the proceeds derived as a result of their unlawful and/or inequitable conduct.

77.    Defendants should be compelled to provide restitution to Plaintiff and Class members and/or to disgorge into a common fund or constructive trust for the benefit of Plaintiff and the Class, all proceeds received by Defendants, or either of them, from any unlawful or inequitable method, act, practice or conduct described in this Complaint which has inured to the unjust enrichment of Defendants, or either of them.

78.    Defendants should further be enjoined from continuing to engage in any unlawful or inequitable act alleged in this Complaint.

## COUNT IV

### UNDER THE DECLARATORY JUDGMENT ACT, 28 U.S.C. §2201

### (By Plaintiff and All Class Members)

79.     Plaintiff repeats and realleges paragraphs 1 through 54 as though set forth herein.

80.     Pursuant to 28 U.S.C. §2201, Plaintiff and the Class seek a declaratory judgment that the increased credit card interest rates and APRs and Defendants' failure to provide the requisite notice of such increased credit card interest rates and APRs that are challenged in this action, are unlawful under the contracts, laws and regulations implicated by this action.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff and the Class pray for judgment against Defendants, jointly and severally, as follows:

(1)     Certifying the Class pursuant to Rules 23(a), 23(b)(2), and 23(b)(3) of the Federal Rules of Civil Procedure, certifying Plaintiff as a representative of the Class and designating her counsel as counsel for the Class;

(2)     Awarding Plaintiff and the Class compensatory damages, in an amount exceeding $5,000,000;

(3)     Awarding Plaintiff and the Class statutory and exemplary damages where permitted;

(4)     Permanently enjoining Defendants from continuing to engage in the unlawful and inequitable conduct alleged herein;

(5)     Declaring that Defendants have engaged in the unlawful and inequitable conduct alleged herein;

(6)    Ordering Defendants to make restitution and/or disgorge into a common fund or a constructive trust all monies paid by Plaintiff and the Class to the full extent to which Defendants were unjustly enriched by their unlawful and/or inequitable conduct alleged herein;

(7)    Granting Plaintiff and the Class the costs of prosecuting this action, together with interest and reasonable attorney's fees; and

(8)    Granting such other relief as this Court may deem just and proper under the circumstances.

## JURY DEMAND

Plaintiff and the Class demand a trial by jury on all issues so triable.

Dated: Milton, Massachusetts
        October 8, 2009

   _/s/ Stephen G. Hennessy_____
**STEPHEN G. HENNESSY, ESQ. (BBO 549914)**
P.O. Box 477
Milton, MA  02816
Tel. (617) 696-1600
Fax. (617) 696-1667

**WHALEN & TUSA, P.C.**
Joseph S. Tusa
Paul C. Whalen
33 West 19th Street, 4th Floor
New York, NY  10011
Tel. (212) 400-7100
Fax. (212) 658-9685

**SCOTT + SCOTT LLP**
Joseph P. Guglielmo
29 West 57th Street
New York, NY 10019
Tel. (212) 223-6444
Fax. (212) 223-6334

*Attorneys for Plaintiff*

24